MORGAN A. STIVERS and VIRGINIA E. STIVERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent HOWARD C. STIVERS and AMY STIVERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
STIVERS v. COMMISSIONER
Docket Nos. 1108-69, 1261-69.
United States Tax Court
T.C. Memo 1973-244; 1973 Tax Ct. Memo LEXIS 43; 32 T.C.M. (CCH) 1139; T.C.M. (RIA) 73244; October 31, 1973, Filed Erwin Lampe, for the petitioners. Jonathan A. Brod, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: *These consolidated proceedings contest deficiencies for 1961 and 1963 determined as follows: 2 1961
1963 Morgan A. and Virginia E. Stivers
$3,855.62
$69,301.01
Howard C. and Amy Stivers
164.79
62,480.06
Certain concessions have been made by both parties. The questions remaining for decision are: (1) Whether the gains and losses from certain real estate transactions were the gains and losses from property held primarily for sale to customers in the ordinary course of the business of Morgan A. Stivers and Howard C. Stivers; (2) Whether Morgan A. Stivers *45 and Howard C. Stivers were in the business of selling real estate so as to incur liability for self-employment taxes; and (3) Whether advances made to and for the benefit of Jean Stivers created a bona fide debt, and, if so, whether the debt became wholly worthless and deductible in 1961, 1962, or 1963. FINDINGS OF FACT The stipulated facts are so found and are incorporated herein by this reference. Petitioners Morgan A. Stivers (hereafter Morgan) and Virginia E. Stivers, husband and wife, resided in Long Beach, California, during the years in issue and at the time they filed their petition in this proceeding. On June 3, 1963, 3 they filed their 1961 joint Federal income tax return, and, on January 3, 1964, they filed an amended 1961 return. In 1964, they filed a timely 1963 joint return. They filed all these returns with the district director of internal revenue at Los Angeles, California. Petitioners Howard C. Stivers (hereafter Howard) and Amy Stivers, husband and wife, resided in Long Beach, California, during the years in issue and at the time they filed their petition in this proceeding. In 1964, they timely filed their 1963 joint Federal income tax return *46 with the district director of internal revenue at Los Angeles, California. Issues 1 and 2 Howard and Morgan were born in 1899 and 1902, respectively, on a farm in Kentucky. They moved to California in 1919 to work for an older brother, Glenn Stivers (hereafter Glenn), who had established himself as a carpenter-contractor. During the late 1920's, the three, along with a fourth brother, Archie Stivers (hereafter Archie), formed a partnership, Stivers Brothers. Archie died in 1947, and the three brothers reorganized Stivers Brothers in 1948. Glenn withdrew as an active partner in Stivers Brothers in 1954, but, since his withdrawal 4 was not completed until 1955, profits of Stivers Brothers for the 1955 taxable year [1] were divided equally. In 1954, Glenn withdrew partnership funds to purchase building sites in Santa Ana. He set up a business in Tustin, California. The business was operated as the "Glenn and Morgan Stivers" partnership, and *47 its returns indicated that one-half of the profits went to Glenn and his wife and the other half went to Morgan and his wife. However, Morgan and his wife reported only one-quarter of the profits on their Federal income tax returns, and Howard and his wife reported one-quarter on their returns. Glenn became ill and unable to carry on his separate operation of building commercial offices and shops. He started selling the Santa Ana land in 1956 and sold the last lot on October 13, 1960. The assets of the "Glenn and Morgan Stivers" operation were finally distributed on October 31, 1960. Petitioners' share of the profits was shown under sales of property, "Santa Ana Lots (Glenn and 5 Morgan Stivers)," on the return for the 1961 taxable year of the Morgan and Howard Stivers partnership (hereafter the Partnership). Petitioners formed the Partnership on September 1, 1955, when they withdrew Morgan Hall from Stivers Brothers. Purchased by Stivers Brothers in 1945, Morgan Hall was located in Long Beach and housed dining rooms, banquet halls, a bar, a theater, and other facilities. For the 1956, 1957, 1958, 1959, and 1960 taxable years, petitioners reported the oepration of *48 Morgan Hall and the purchase and sale of two parcels of land in the Partnership's Federal tax returns, but they continued to report all of their other activities as partners on Stivers Brothers' returns. After August 31, 1960, all of their activities as partners were reported by the Partnership. In the operation of petitioners' business, Howard was the field man overseeing all construction while Morgan handled the office and the financing. Morgan and his wife owned and operated two apartment buildings for their separate accounts. These two buildings had been acquired at cost from Stivers Brothers, which had 6 built them in 1953. Gross rental income was $34,499.01 in 1961 and $36,951.65 in 1963. In 1949, Howard and Morgan bought a cattle ranch, the O'Neals Ranch, in Central California. This has been continued as an active cattle operation. On April 30, 1956, petitioners formed a closed corporation, "Stivers Brothers, Limited," with a paid in capital of $32,000. Morgan was the president of the corporation and received salaries of $8,000 in 1957 and $10,000 in each year from 1958 through 1960. Between July 1957, and January 1963, the corporation sold nine parcels of *49 land, two of which had been taken in as part of the sale of a third. Four of the nine parcels were sold unimproved. The corporation built on the other five parcels. Two of the nine parcels were transferred to Stivers Brothers. Five of the nine parcels were held for twelve months or less, and none was held longer than sixteen months. The corporation reported a total of $58,011.49 net long-term capital gains and a total of $14,589.38 net short-term capital gains on these transactions. Between February 1954 and February 1960, Stivers Brothers sold 39 parcels of land purchased between 1941 and 1959. Four 7 of the parcels were sold in one transaction. Twenty-two of the parcels were held no longer than nine months, and, of those, 18 were held no longer than six months. The 39 parcels had a total cost (less depreciation taken before sale) of more than $1,300,000 and were sold for more than $1,640,000. Stivers Brothers reported a net gain of more than $341,000 on the sales of the 39 parcels. For the taxable years 1955 through 1970, the Partnership and Stivers Brothers have had the following income or losses before inclusion of the gains or losses from the sale of real estate: *50 MORGAN & HOWARD STIVERS PARTNERSHIP
Year Ended
Gains (losses) 8/31/56
($ 32,129.54)
8/31/57
( 36,651.92)
8/31/58
( 35,387.87)
8/31/59
( 48,638.79)
8/31/60
( 59,891.20)
8/31/61
( 40,370.79)
8/31/62
( 119,946.13)
8/31/63
( 69,919.90)
8/31/64
( 15,990.97)
8/31/65
( 27,817.41)
8/31/66
( 72,485.00)
8/31/67
( 151,528.00)
8/31/68
( 42,791.00)
8/31/69
( 78,292.00)
8/31/70
( 94,365.00)
TOTAL
($926,205.52)
STIVERS
BROTHERS
Year Ended
Gains (Losses)
8/31/56
($ 2,190.35)
8/31/57
3,953.55
8/31/58
35,221.87
8/31/59
( 31,219.68)
8/31/60
9,036.87 *
TOTAL
$14,802.26
During the taxable years 1955 through 1969, the two partnerships collected gross rentals of more than $1,750,000. The operation of Morgan Hall showed losses as follows: Taxable Year
Loss 1956
$32,129.34
1957
36,651.92
1958
35,387.87
1959
48,638.79
1960
59,891.20
1961
(Amount of loss not determined)
1962
69,391.89
1963
55,809.42
1964
40,485.34
*51 The following parcels of land were sold by the Partnerships: 9 Name
Acq.
Sold
Sale Price
1. Westminster Acreage
3/14/56
7/13/56
$140,000.00
2. Ing Lot - Chestnut
6/ 3/56
8/ 2/57
50,000.00
3. 14662 Horticulture Drive
-
-
32,500.00
*4. 37219-251 Bankside
8/31/60
3/10/61
103,500.00
*5. 1550-60 Locust (lots)
9/30/60
1/30/61
plus house (1560 Locust)
9/30/60
9/30/60
37,050.00
*6. 1136 Fay Lane Anaheim
7/19/58
2/ 8/61
128,500.00
*7. 3321 Lime Avenue
2/ 8/61
3/23/61
34,000.00
*8. 744 Chestnut Ave.
5/31/60
3/21/61
105,000.00
*9. Tower Motel, Wichita
8/31/59
4/ 1/61
65,000.00
*10. Tower Motel, Trust Deed
4/ 1/61
4/ 1/61
22,500.00
*11. Harper-Findley - Property
5/ 8/61
6/ 5/61
22,000.00
Foreclosure
*12. 4-1/2 acres - Horticulture Drive
8/22/60
8/17/61
25,000.00
*13. Cartagena-Lime lot
9/ 1/59
8/24/61
$ 10,000.00
*14. Santa Ana Lots (Glenn & Morgan
9/ 1/59
8/31/61
-
Stivers)
*15. Elsinore Lots
9/ 1/60
1/12/62
3,334.50
*16. Sorrento Drive Lots
9/ 1/60
11/24/61
36,635.20
*17. 1/2 interest - 107 acres Madera
3/ 1/60
5/14/62
37,500.00
Ranch
*18. Escondido - 161.62 Acres
3/22/60
4/22/63
890,560.00
*19. Escondido - 106.9 acres (installment
9/25/62
6/28/63
586,300.00
sale
20. U.S. Desert Land
1/20/57
1963
-0-
21. 2046 Cedar (Boydston)
-
-
65,000.00
22. 1740 Hayes Ave.
3/31/60
8/20/65
4,608.76
23. Arrowhead lot
8/ /53
12/11/64
4,135.94
24. 74.89 acres -
2/10/58
8/25/65
58,250.00
25. 10442 Montgomery St. (1/2 interest)
-
8/25/65
12,250.00
26. 1740 Hayes Ave.
3/31/60
6/ 2/66
$ 13,482.00
27. Nursery School (Overland Park, Kan.)
9/ /61
1/ /66
12,654.55
28. Ore-Land - 400 acres
1965
5/ /68
57,503.00
29. 9345 Highdale
10/ /67
11/ /67
24,139.00
30. 1843-49 Cedar
9/ /59
11/30/67
270,000.00
31. Mobile Home Park
1963
10/ 5/67
464,000.00
32. Ore-land 13.33 acres (1/2 interest)
1964
12/ 5/69
117,478.00
33. 124-144 E. 9th St.
8/ /67
9/26/69
12,428.00
34. Savonna Walk House
9/26/69
9/26/69
21,400.00
35. 11305-09 Atlantic
10/ /67
36./67
36. Gilmar Hospital
5/ /65
6/24/70
610,000.00
TOTALS
$4,111.266.95
*52 Name
Total Cost
Total Gain
Months
(less
Held deprec.)
1. Westminster Acreage
$114,194.00
$25,737.00
3
2. Ing Lot - Chestnut
22,500.00
27,500.00
14
3. 14662 Horticulture Drive
37,288.37
(4,788.37)
-
*4. 37219-251 Bankside
120,227.00
(16,727.00)
6
*5. 1550-60 Locust (lots)
0-4
plus house (1560 Locust)
35,999.46
1,050.54
*6. 1136 Fay Lane Anaheim
104,423.44
24,076.56
33
*7. 3321 Lime Avenue
32,242.90
1,757.10
1
*8. 744 Chestnut Ave.
96,407.90
8,592.10
10
*9. Tower Motel, Wichita
55,732.24
9,267.76
19
*10. Tower Motel, Trust Deed
43,000.00
(20,500.00)
0
*11. Harper-Findley - Property
21,000.00
1,000.00
1
Foreclosure
*12. 4-1/2 acres - Horticulture Drive
28,556.72
(3,556.72)
12 *13. Cartagena-Lime lot
$ 9,224.02
$ 775.98
24
*14. Santa Ana Lots (Glenn & Morgan
-
18,557.35
24
Stivers)
*15. Elsinore Lots
2,513.00
821.50
16
*16. Sorrento Drive Lots
35,074.94
1,560.26
15
*17. 1/2 interest - 107 acres Madera
30,033.91
7,466.09
26
Ranch
*18. Escondido - 161.62 Acres
553,632.90
336,927.10
37
*19. Escondido - 106.9 acres (installment
403,371.04
182,928.96
9
sale
20. U.S. Desert Land
1,000.00
(1,000.00)
75
21. 2046 Cedar (Boydston)
48,180.17
16,819.83
-
22. 1740 Hayes Ave.
4,608.75
-0-
65
23. Arrowhead lot
685.94
3,450.00
136
24. 74.89 acres -
29,740.00
28,510.00
90
25. 10442 Montgomery St. (1/2 interest)
13,366.48
(1,116.48)
- 26. 1740 Hayes Ave.
$ 4,514.76
$ 8,967.24
74
27. Nursery School (Overland Park, Kan.)
22,872.88
(10,218.33)
52
28. Ore-Land - 400 acres
35,580.00
21,923.00
35
29. 9345 Highdale
27,763.00
(3,624.00)
1
30. 1843-49 Cedar
205,471.00
64,529.00
98
31. Mobile Home Park
435,946.00
28,054.00
50
32. Ore-land 13.33 acres (1/2 interest)
90,167.00
27,311.00
65
33. 124-144 E. 9th St.
10,919.00
1,449.00
25
34. Savonna Walk House
22,000.00
(600.00)
-0-
35. 11305-09 Atlantic
36./67
36. Gilmar Hospital
390,599.00
219,401.00
61
TOTALS
$3,133,600.82
$977,666.13
We must determine whether those parcels with asterisks were held primarily for sale in the ordinary course of petitioners' business.
*53 (The figures appearing in the foregoing chart was taken from portions of the Commissioner's brief to which no objection was made by petitioners.) 12 The Westminster acreage (item 1), acquired by petitioners at the same time as Morgan Hall, was unimproved and was sold because of losses on the operation of Morgan Hall. The Ing lot (2) was acquired by the Partnership from Stivers Brothers in 1956. The Bankside property (4) had been taken in trade for an apartment building in Long Beach, but was too far from the headquarters of the Partnership for efficient management. The Sorrento Drive lots (16) were taken in trade as part of the sale of the Bankside property. The Partnership built an apartment building on the Fay Lane property (6). The Lime Avenue property (7) was taken in trade as part of the sale of the Fay Lane property. The Tower Motel (9 and 10) was taken in trade for apartment buildings in Long Beach. The Commissioner has conceded that the 5-1/2 acres on Horticulture Drive (12), an avocado grove, was not held primarily *54 for sale in the ordinary course of business. The Santa Ana entry (14) represents petitioners' shares in the final liquidation of the Glenn and Morgan partnership. 13 The Madera Ranch (17) was originally acquired with a cousin who wanted to operate it. It was later leased and then sold. The Desert land entry (20) represents the loss of a deposit on an attempted purchase of land. The Cedar entry (21) represents the construction of a building for a purchaser who was unable to pay the fee. Profit on the construction has been reported on an installment basis as ordinary income by both Stivers Brothers and the Partnership. 1740 Hayes (22 and 26) was the storage yard for the Partnership's building business. The Arrowhead lot (23) was taken in trade for other real estate. The Oregan land (28 and 32) was bought for its timber. Items 18, 19, and 24 reflect a series of transactions involving land near Escondido, California. In the fall of 1959, William S. Crow (hereafter Crow), a real estate broker with a listing to sell four contiguous parcels of land, totaling 162 acres, near Escondido, contacted Gus Swanson (hereafter Swanson), who had previously acted as petitioners' *55 real 14 estate agent and whose opinion petitioners valued. On November 13, 1959, petitioners entered into four contracts to purchase the parcels, and, on March 22, 1960, the escrows were closed on the transactions. The 162 acres were acquired at $2,300 per acre plus commissions and title expenses. The acreage was purchased subject to a first trust deed (first mortgage) of $126,676.95. In addition, four second trust deeds amounting to $165,939.67 were executed by petitioners. A bank loaned petitioners the money for the downpayment on the acquisition. Prior to this acquisition, petitioners had never entered into a contract involving so many acres of land and so high a purchase price. On January 5, 1960, before the property was out of escrow, Swanson, who was serving as petitioners' real estate broker, offered the property to Allied Properties, a potential purchaser for $3,850 per acres. This offer had been discussed with and authorized by Morgan. The offer was rejected because the offeree was only interested in income producing property and did not believe that the Escondido property would produce such income. Before the property was out of escrow, petitioners advertised *56 the property in the Long Beach Independent Press 15 Telegram as for sale and "ripe for subdivision," and developed a sales flyer offering the land at $2,950 per acre. On March 1, 1960, before the property was out of escrow, Morgan mailed a copy of a plot covering the 162 acres to a real estate broker with Rainbow Realty Company (hereafter Rainbow), which had been contacted to sell the acreage for petitioners. On November 9, 1960, Morgan asked an attorney, who was advising him on rezoning the acreage, to write a letter indicating the the property could be rezoned for subdivision. Morgan intended to show this letter to subdividers interested in the property. Between March 22, 1960 and the beginning of 1962, petitioners contacted numerous real estate brokers and gave numerous listings to sell the property. On April 10, 1960, petitioners gave two brokers three-month open listings to sell the acreage. On May 5, 1960, petitioners gave another broker a 60-day listing to sell the property at $3,500 per acre. Listings were given to various brokers on September 22, 1960, October 12, 1960, January 25, 1961, June 12, 1961, July 28, 1961, and near the end of 1961. 16 Also between *57 March 22, 1960 and the beginning of 1962, petitioners distributed sales flyers offering the property for sale. Flyers offering the property at $3,500 per acre were distributed on May 6, 1960, at the end of 1960, on March 27, 1961, on March 30, 1961, on April 15, 1961, during the middle of April, 1961, on April 26, 1961, and on June 6, 1961. Sometime in the spring of 1961, petitioners developed a sales flyer offering the property for sale at $3,450.00 per acre. Petitioners advertised the property in newspapers as for sale in May 1960, on December 12, 1960, on December 13, 1960, on December 29, 1960, on January 5, 1961, on February 12, 1961, and on April 23, 1961. The advertisements in December 1960 and January 1961 said the property was "priced for quick sale." The April 1961 advertisement referred to the property as a "Senior Citizens Site." "For sale" signs were placed on the property in November 1960. In early 1961, a large "for sale" sign was erected by Crow at the suggestion of Swanson. On July 1, 1960, Morgan and his wife entered into an escrow with Maiden-Fair Company to sell the property at $3,500 per acre. Swanson was petitioners' broker in the sale. 17 But *58 on August 26, 1960, Maiden-Fair cancelled the escrow because their engineers' report was not favorable. In May 1961, Crow showed the 162 acres to the Del Webb Company for a potential senior citizens project. In June 1961, Rainbow submitted the property for sale to George Ponty Homes, Inc. In 1962, petitioners acquired 106.9 acres of unimproved land, contiguous with the 162 acres, for a total of $315,000 plus costs and commissions. The escrow for this purchase was opened April 26, 1962, and closed September 25, 1962. Petitioners paid $50,000 in cash, assumed trust deeds for $85,947.99, and executed new, second trust deeds for $179,052.01. On May 24, 1962, petitioners created a new sales flyer offering the full 270 [2] acres at $6,000 per acre. The flyer stated that acreage had been approved by the Federal Housing Administration (hereafter FHA) as a senior citizens center and that petitioners had preliminary plans and engineering for such a center. *59 18 On June 20, 1962, Morgan entered into two escrows, neither of which was closed, to sell the property to Newport Western Corporation for $6,300 per acre. Swanson-Barcus, Inc. (hereafter Swanson-Barcus) was to receive commissions of $38,880 on the first escrow, covering the 162 acres, and of $25,920 on the second, covering the rest of the land. On August 17, 1962, Morgan communicated with a potential purchaser of the entire acreage. On September 13, 1962, Morgan gave another potential purchaser a firm right, in effect for 48 hours, to acquire the 270 acres for $5,500 per acre. On December 4, 1962, a real estate broker wrote to petitioners concerning a client's interest in purchasing the property for a senior citizen project. An exclusive twelve-day listing on the property, described as "Planned for Senior Citizen Development," was given to a broker on December 20, 1962. The same broker was given another exclusive listing during January 1963. On April 22, 1963, petitioners sold the 162 acres to Royart Corporation for $890,560, or approximately $5,500 per acre. On June 28, petitioners sold the rest of the land to Royart Corporation in an installment sale for $586,300, *60 or approximately $5,500 per acre. 19 The profit on the sale of the 162 acres was $336,927.10, as follows: SALES PRICE
$890,560.00
Less: Cost of Land
$390,130.21
Commission: Swanson-Barcus
66,792.00
Commission: Hauser Realty and Roy Stump
53,728.52
Engineering & Architect expenses
7,085.25
Other expenses
35,896.92
TOTAL COST OF LAND
553,632.90
PROFIT
$336,927.10
The profit on the sale of the 106 acres was $6,763.96, as follows: SALES PRICE
$586,300.00
Less: Cost of Land
$319,362.31
Commission: Swanson-Barcus
43,972.50
Commission: Hauser Realty and Roy Stump
35,371.48
Engineering & Architect expenses
4,664.75
PROFIT
$336,927.10
The profit on the sale of the 106 acres was $6,763.96, as follows: SALES PRICE
$586,300.00
Less: Cost of Land
$319,362.31
Commission: Swanson-Barcus
43,972.50
Commission: Hauser Realty and Roy Stump
35,371.48
Engineering & Architect expenses
4,664.75
TOTAL COST OF LAND
403,371.04
PROFIT
$182,928.96
CONTRACT PRICE ON INSTALLMENT SALE SALES PRICE
$586,300.00
LESS: Mtg. Assumed
258,029.33
Contract Price
$328,270.67
GROSS PROFIT PERCENTAGE
Gross Profit Realized
$182,928.96 = 55.72%
The Contract Price
$328,270.67
Cash Received = $12,139.19
1963 Cash Profit = $12,139.19 X 55.72% =
$6,763.96*
*61 During the 1967 taxable year, Prudential Savings & Loan Association foreclosed on 88 acres of the Escondido acreage from the 106-acre parcel and accepted the Stivers' redemption rights to pay the underlying trust deeds and take title. Petitioners took out a loan to pay Prudential. Petitioners did not intend to develop the 88 acres. They wanted to sell the acreage as soon as possible to pay off the loan with which they had acquired the property.To accomplish the sale, sales flyers with projected net profits were used. In 1959, Swanson had presented the property to petitioners as a good location for a retirement center for senior citizens. In late 1959 and early 1960, petitioners contacted a carpenter-contractor, a lumber dealer, an electrical contractor, a dry-well and lathing contractor, and a bank officer 21 to discuss the possibility of developing such a retirement center. The evidence does not indicate that any contracts or feasibility reports resulted from those meetings. The building activities of petitioners had been confined to individual apartments and small office buildings financed through loans from banks, savings and loan associations, and insurance companies. Petitioners had never financed any of their operations through the FHA and were not familiar with the procedures necessary for FHA approval and guarantees. On May 22, 1961, Morgan entered into an agreement with Swanson-Barcus to qualify the 162 acres for a senior citizens development. The agreement was amended on August 1, 1961, to provide that, if petitioners decided to sell the property, Swanson-Barcus would have the right to handle the sale and receive a commission. During July 1961, Morgan entered into a contract with John August Reed (hereafter Reed), an architect, to draw the plans necessary to obtain FHA site approval. On October 2, 1961, Morgan entered into another contract with Reed to complete all preliminary plans and specifications necessary to obtain FHA preliminary approval of an Escondido project. 22 On November 3, 1961, the FHA gave tentative approval to the single homes portion of the project. Before granting final approval, the FHA required Morgan to file two prints of the overall tentative plan with contour information. If an applicant's basic design proposal is accepted, the FHA requires a map in final legal form, a grading plan, improvement plans, a preliminary soils report, and proposed restrictions and covenants. Petitioners never fulfilled the requirements for a final commitment from the FHA. On March 21, 1962, Morgan received written confirmation that Pacific Western Mortgage Company would furnish all of petitioners' financing requirements for an Escondido project. On August 3, 1962, after petitioners had acquired the additional 106.9 acres, Swanson-Barcus executed a document providing for a joint venture with Morgan to develop a senior citizens project. Swanson-Barcus was to act as the developer in association with Fryar Construction Company, Reed, and Sholders, Tanner, Marquardt and Associates, Inc. Morgan never executed the agreement. From May 23, 1962, to December 7, 1962, petitioners made several profit estimates on an Escondido senior citizens project. 23 On September 23, 1962, Hancock-California Co. offered to begin final negotiations on complete financing for a senior citizens development on the Escondido property. On October 9, 1962, Morgan entered into an agreement with Sholders, Tanner and Marquardt, engineers, and Reed for preliminary engineering and architectural work. Reed and Dean Marquardt (hereafter Marquardt) were especially concerned with protecting their interests if petitioners were to sell the land. An amendment ensuring that Reed and Marquardt would retain their rights in their designs when the property was sold was added on the day the agreement was signed because Morgan stated that he intended to sell the property. In late November 1962, Howard told Marquardt that petitioners had decided to develop the property because they could not sell it. In their operations, petitioners acquired some properties to develop and then sell. In the partnership returns for the 1962 and 1963 taxable years, the gains from the sales of the Escondido property, the Elsinore lots, the Sorrento Drive lots and the 24 interest in the Madera ranch were treated as long-term capital gains. The Commissioner determined that those gains should be treated as ordinary income. In the partnership return for the 1961 taxable year, the gains and losses from from the sales of the Bankside property, the Locust lots and house, the 1136 Fay Lane property, the 3321 Lime Avenue property, the 744 Chestnut Avenue property, the Tower Motel and trust deed, the Harper-Findley property, the Cartagena-Lime lot, and the Santa Ana lots were treated as ordinary income and ordinary losses. In their petitions, petitioners asserted that none of those gains and losses should have been treated as ordinary income or losses. Issue 3 On August 17, 1938, Howard and Jean Hamilton Stivers (hereafter Jean) were granted a final decree of divorce. Howard has subsequently remarried, but Jean has not. During the marriage of Jean and Howard, Jean and Morgan were close friends. After the divorce, petitioners were Jean's closest friends. Because of poor health, Jean did not work after the divorce. Petitioners paid all of her extensive medical bills and all of her personal expenses. 25 Howard and Jean had one child, Jeanene, who was four or five years old at the time of the divorce. Jeanene lived with her mother after the divorce. Petitioners paid for Jeanene's schooling at a private school. Howard also provided her personal living expenses for a number of years and claimed her as a dependent on his income tax returns. Jean became interested in mining claims and moved to New Mexico in 1944 or 1945 because she found that the climate was good for her health. In 1946, she purchased two mica mines, Apache No. 1 and Apache No. 2, in New Mexico from Elmer Burch (hereafter Burch). She then filed a Notice of Lode Mining Location pursuant to Federal mining laws. Under the Federal mining laws, an individual may assert possession to specific public lands for the purpose of extracting minerals from them. To locate a claim, an individual must discover a valuable mineral, mark the boundaries of the claim, post notice of the claim, and record a copy of the lcoation in the county recorder's office. To maintain the claim, "annual assessment work," labor or improvements worth $100, must be completed each year before noon of September 1. A statement that the work has been completed 26 must be recorded in the county recorder's office. Failure to perform or record annual assessment work permits others to locate, or "jump," the claim. Jean asked petitioners to provide her with funds to develop the Apache mining claims. Howard felt an obligation to finance her to make her independent. He also believed that the advances to Jean would help Jeanene. Morgan reluctantly advanced the funds on Howard's insistence. Petitioners hoped to be repaid from the proceeds of the mining operations. They realized that the mine was the only source of repayment Jean had. The last proof of labor report recorded by Jean was dated June 24, 1958. Jean's brother filed a proof of labor report on August 30, 1960. Because of an accident in 1961, Jean was not aware that the 1961 proof of labor report had not been filed. she had no intention of giving up the mine, but, on October 13, 1961, Burch jumped the claim. Burch did not file any proof of labor reports. In 1967, Jean, who had never lost hope that she could reacquire the mines, returned to the mines with Jeanene. 27 They reacquired the claims in March 1967, and Jeanene filed a proof of labor report in August 1967. In 1970, this claim was jumped and they lost the mines. Jean had no net income from the mining operation. From November 1947, through August 1949, petitioners made a series of advances to Jean totaling $21,822 of which $12,514.37 was paid directly to her and $9,307.63 was paid to third parties. None of these advances has ever been repaid. On their books, petitioners treated the amount of the advances as a bad debt in the 1949 taxable year. Between 1949 and 1962, petitioners made the following advances: Partnership Year
Net Advances Ended August 31
1950
$ 2,710.99
1951
315.78
1952
14,173.75
1953
30,687.37
1954
24,655.06
1955
45,675.71
1956
12,359.13
1957
13,033.37
1958
7,689.01
1959
301.14
1960
500.00
1961
2,345.00
1962
-0-
$154,446.31
Those advances were paid as follows: Paid To
Amount Jean Stivers
$ 58,102.09
Third Parties
100,886.01
Jeanene Stivers
3,419.55
James T. Irwin (and J. B.
5,228.50
Irwin)
$167,636.15
Less Credits
13,189.84
$154,446.31
Jean did not execute any promissory notes or sign any documents reflecting the above advances. Jean kept no records of the advances, but petitioners kept a ledger reflecting most of the advances. The following advances, totaling more than $18,000 were for personal expenses: all of the advances to Jeanene; advances of $875 to Jean for a trip to Mexico; advances of $300 to Jean for a trip to Washington and new York; advances of $160 for Jean's hotel rooms in Santa Fe; $83.28 paid for automobile insurance on a car lent to Jean and her brother; $100 paid for heavy winter clothes; 72 payments, totaling $3,504.73, for insurance on Jean's life; advances of $2,525 to Jean's father; $750 for the funeral of Jean's father; payments of Jean's rent totaling $1,400; and $750 paid to Jean's attorney in a suit for rent brought by Jean's landlord. 29 Undetermined portions of $7,000 received by Jean in 1947 and 1948, of $3,911 received in 1949, and of $14,000 received in 1954 and 1955 were used for Jean's personal living expenses. In addition, petitioners paid $2,345 in 1960 and 1961 to D. M. Brewer, who agreed to sell the mines for petitioners. James Irwin, Jean's brother, lived with Jean at the mine and travelled with her. Many of the advances paid for his personal living expenses. From 1952 to 1960, petitioners wrote over 30 letters to Jean's creditors advising them that petitioners had not authorized Jean to charge amounts to petitioners. Petitioners stated that they were not liable for, and that they would not pay, amounts charged to them by Jean. All of the amounts disclaimed in the letters were eventually paid by petitioners and are included in the claimed deductions. On September 1, 1957, Jean gave a compressor, worth $750 to petitioners. Jean had purchased the compressor and charged it to petitioners, who had made payments totaling $7,563.99. On May 11, 1954, Jean purchased mining equipment and materials from N. C. Ribble (hereafter Ribble). In payment 30 she gave a note for $29,644.80, which bore interest at 6 percent and was co-signed by Morgan. She assigned her mining claims to Ribble as collateral. Jean made no payments on the note. In July 1956, the Partnership purchased the Ribble note. That assignment was reflected by the following accounting entry: J-270
9/1/56
Investment
$35,000.00
Notes payable
F & M Bank
$30,000.00
N. C. Ribble
5,000.00
To record purchase of $35,000.00 mortgage on Apache mining property situated at Petaca, Rio Arrista Co., assuming responsibility of payment of mortgage to N. C.Ribble Co., Albuquerque, to the extent of $25,000 - $20,000 paid in cash and $5,000 note given to Ribble - percentage of investment to be determined. Petitioners never took any legal steps to collect from Jean the amounts they had advanced to her. On the return for the 1963 taxable year, the Partnership deducted $35,000, representing the Ribble note, as a long-term capital loss. The Commissioner disallowed the deduction. In their petitions, petitioners claimed an additional 31 capital loss of $154,577.23, representing the other advances to or for the benefit of Jean. OPINION Issue 1 *62 Petitioners argue that certain pieces of real estate were capital assets under section 1221, Internal Revenue Code of 1954, [3] or, alternatively, were assets within the scope of section 1231. Under either section, petitioners must prove that the parcels of land were not "held * * * primarily for sale to customers in the ordinary course of * * * [petitioners"] trade or business." Sections 1221(1) and 1231(b) (1) (B). Whether real estate is held primarily for sale to customers in the ordinary course of a taxpayer's business is entirely a factual question. Los Angeles Extension Company v. United States, 315 F.2d 1 (C.A. 9, 1963), affirming 62-1 U.S.T.C. par. 9404 (S.D.Cal. 1962), Fritz Thompson, 38 T.C. 153 (1962), reversed on another issue at 322 F.2d 122 (C.A. 5, 1963), C. E. Mauldin, 16 T.C. 698 (1951), affd. 32 195 F.2d 714 (C.A. 10, 1952). Numerous courts have considered the issue in numerous factual settings, no two of which are identical. Although some helpful considerations emerge from these cases, each case must be considered on its own facts. James H. Merritt, Sr., 47 T.C. 519, 529 (1967), affd. 400 F.2d 417 (C.A. 5, 1968). Accordingly, rather than review the cases cited by petitioners and the Commissioner, we confine ourselves to the evidence before us and to the arguments advanced by the parties to explain the significance of that evidence. *63 O'Donnell Patrick, 31 T.C. 1175 (1959), affd. 275 F.2d 437 (C.A. 7, 1960). The Partnership's Business The record indicates that one of the Partnership's businesses was selling improved and unimproved real estate. The Partnership sold substantial amounts of realty in frequent and continuous sales. Goodman v. United States, 390 F.2d 915 (Ct. Cl. 1968), certiorari denied 393 U.S. 824 (1968), Raymond Bauschard, 31 T.C. 910 (1959), affd. 279 F.2d 115 (C.A. 6, 1960), and Arthur E. Wood, 25 T.C. 468 (1955). Between 1956 and 1970, the Partnership sold approximately 35 pieces of property, approximately half of which were sold in the 1961, 1962, and 1963 taxable years. 33 The Commissioner urges us to consider sales by Stivers Brothers and Stivers Brothers, Limited, to indicate even greater continuity and frequency of sales. We note that the sales of all three businesses between 1954 and 1970 total more than 80, but we consider the Partnership's activity sufficient to indicate frequent and continuous sales of real estate. Petitioners and the Commissioner attempt to compare the Partnership's *64 income from rentals and Morgan Hall with its income from sales. The Commissioner argues that between 1956 and 1970, the Partnership's sales of real estate were profitable while their other operations showed losses. Petitioners speak of "gross rentals" of almost two million dollars and ask us to allocate expenses somehow between rentals and sales. We need not attempt such computations. Petitioners have not proven that the Partnership's sales of real estate were not substantial enough to be considered a business. The Partnership may have had more than one business, and the fact that it rented property, operated Morgan Hall, built for others, and ran a ranch does not mean it could not also have been conducting a sales business. C. E. Mauldin, supra, and Goodman v. United States, supra.34 Petitioners have tried to establish that most of the Partnership's sales involved the operation of businesses other than selling real estate. Most of petitioners' explainations of why the Partnership sold certain parcels of land are not supported by the evidence and do not convince us that petitioners were not in the business of selling real estate. Petitioners assert *65 that many sales were made to offset losses on Morgan Hall and to meet other Partnership obligations. Even if these losses and obligations necessitated sales, we consider those sales to reflect the increased activity of one business to accommodate another business. The fact that petitioners had to sell to continue other businesses is not controlling. C. E. Mauldin, supra.Petitioners also assert that some of the lots sold had been taken in trade for other property, but the existence of such trades would indicate that petitioners were capable of dealing, and anxious to deal, in real estate. Finally petitioners assert that many of the sales represented the disposition of miscellaneous assets which were not compatible with the Partnership's building plans, but petitioners do not submit convincing evidence to indicate 35 why the assets were acquired or when and why they were determined incompatible. The fact that neither petitioner had a broker's or salesman's license certainly is not determinative. C. E. Mauldin, supra, and *66 Goodman v. United States, supra. The Sales Having concluded that the Partnership was in the business of selling improved and unimproved real estate, we must examine the disputed sales to determine whether the property sold was held primarily for sale to customers in the ordinary course of the business. We note that the word "primarily" means "of first importance" or "principally." Malat v. Riddell, 383 U.S. 569 (1966). The Escondido Acreage: After careful consideration of all of the facts surrounding the purchase, the holding, and the sale of the Escondido property, we conclude that that property was acquired and held primarily for sale to customers in the ordinary course of the Partnership's business. In 1960, before the property was out of the purchase escrow, petitioners attempted to trade or sell it. Beginning in 1960 and continuing throughout the period petitioners held the land, listings 36 were given, sales flyers were distributed, and advertisements were run. Signs were placed on the property to indicate that it was for sale. Petitioners entered into several contracts, to sell the land. We conclude that petitioners' consistent attempts *67 to sell the Escondido acreage indicate that petitioners held the property primarily for sale and not the contrary. Petitioners point to certain activity which, they argue, indicates that they considered developing the property as a retirement center, which would give them a steady income upon their own retirement. But petitioners never carried out any of their plans to build such a center, never completed the requirements for FHA approval, and never accepted offered loans. The activity may indicate an intent to sell the land as a good location for a senior citizen center or to build and then sell such a center. Petitioners have not convinced us that they were interested in developing and operating a retirement center. Petitioners assert that their sales activity represented no more than an attempt to establish a valuation for financing. Petitioners' assertion is based merely on their 37 own testimony. They have not shown that they had no other means to establish a value or that such extensive activity, including the execution of binding contracts, was necessary. Accordingly, we reject their assertion. Petitioners also assert that the Escondido acreage was so large *68 and involved such heavy and unusual financing that its purchase, retention, and sale was outside of the ordinary course of the Partnership's business. In fact, petitioners never secured FHA approval and have not shown that they ever intended to do so. They have introduced no evidence to indicate the extent of their prior financing. The size of the acreage may suggest that petitioners were making the business more sophisticated but does not convince us that the sale of the Escondido land should not be treated as a continuation of petitioners' ordinary sales activity. Accordingly, we hold that petitioners held the Escondido acreage primarily for sale to customers in the ordinary course of petitioners' business. 1550-60 Locust (lots and house): Petitioners claim that this property was purchased to build an apartment house but was sold when financing could not be arranged. Even if we 38 were willing to accept petitioner's claim, which is based only on Morgan's testimony, we find no evidence to indicate whether petitioners intended to retain the land once the apartment house was built. Petitioners introduced no evidence to compel us to find that the land was held for any purpose *69 other than sale in the ordinary course of business. Harper-Findley Foreclosure: Petitioners assert that this was somehow a part of the purchase or sale of the Locust lots and house. Because petitioners introduced no evidence on this foreclosure, we hold that this entry represents the sale of property held primarily for sale in the ordinary course of petitioners' business. Cartagena-Lime lot: Petitioners have introduced no evidence to indicate that this lot was held for any purpose other than primarily for sale in the ordinary course of business. 744 Chestnut: Petitioners assert that 744 Chestnut had been leased and produced rent for 10 months and that a depreciation deduction was not questioned. The fact that property is leased does not prove that it was not held primarily for sale, for it would not be unusual to rent property pending 39 its sale. Rollingwood Corp. v. Commissioner, 190 F.2d 263 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court. If we were to consider the depreciation deduction significant, we should also consider equally significant petitioners' reporting the proceeds from the property's sale as ordinary gain on their 1961 returns. *70 Accordingly, petitioners have not proven that 744 Chestnut was not held primarily for sale. 3321 Lime, Tower Motel and Trust Deed, Elsinore lots, and Sorrento Drive lots: Petitioners assert that these pieces of property were taken in trade for other property at various times. Even if we were to accept that assertion, we do not believe it is relevant to our inquiry into the purposes for which petitioners held the pieces of property. Indeed, it merely suggests that petitioners were actively dealing in real estate. 37219-251 Bankside: This property was held for six months. Morgan testified that this property was taken in trade but was too far from the Partnership's headquarters for efficient management. This testimony suggests that the location of the property, which must have been known to petitioners at the time of its acquisition, required the Partnership to hold the property primarily for sale. 40 1136 Fay Lane: Morgan testified that the Partnership built an apartment house on the Fay Lane property and ran into management problems and vacancies "so we though it * * * best to sell it." We do not believe that Morgan's unsubstantiated testimony is sufficient to meet *71 petitioners' burden of proving that the property was not held primarily for sale to customers in the ordinary course of the business. Madera Ranch: This ranch was purchased with a cousin who wanted to operate it but could not afford to purchase it. Morgan testified that the cousin "moved on it and he couldn't make a living on it, so, we leased it for a while and that didn't pay and he wanted to sell it, so, we sold it." He further testified that the ranch was "acquired primarily to help out" his cousin. Although petitioners' purpose at the time of acquisition may be relevant, the ultimate question is the purpose for which the property was held at the time of the sale. Estate of Peter Finder, 37 T.C. 411 (1961). Morgan's testimony is of little value in the resolution of that ultimate question. We hold that petitioners have not met their burden of proving that the Commissioner's determination regarding the ranch is incorrect. 41 Santa Ana lots: This entry reflected the sale of property which had been held by the Glenn and Morgan Partnership. Petitioners argue that Glenn had not been authorized by them to conduct the Glenn and Morgan enterprise and that their *72 acceptance of the proceeds of the sale of the Santa Ana lots was merely an attempt to recover an investment. The lack of evidence for this argument prevents our accepting it. Petitioners' further unsubstantiated assertion that the Santa Ana land was not suitable for their operations is similarly unconvincing. Petitioners have not shown that this property was not held primarily for sale in the ordinary course of business. In conclusion, we hold that petitioners have not shown any of the property to have been held other than primarily for sale in the ordinary course of business. Issue 2 Our holding that petitioners were in the business of selling improved and unimproved property resolves the second issue, liability for self-employment taxes, under section 1401, in favor of the Commissioner. 42 Issue 3 Petitioners assert that the amounts advanced to Jean were bona fide debts which became worthless and deductible in 1963 under section 166. Petitioners suggest that, alternatively, those amounts were business losses deductible under section 165. The Commissioner disallowed the $35,000 deduction and contends that none of the advances was deductible in 1963. *73 Petitioners have the burden of proving the existence of a bona fide debt. Harry K. Oliphint, 24 T.C. 744 (1955), affd. per curiam 234 F.2d 699 (C.A. 5, 1956). Petitioners also have the burden of proving that the purported debt became worthless in 1963. Denver & Rio Grande Western Railroad Co., 32 T.C. 43 (1959), affd. 279 F.2d 368 (C.A. 10, 1960), and Earl V. Perry, 22 T.C. 968 (1954). We hold that petitioners have proved neither the existence of a debt nor the time at which such a debt would have become worthless. We are not convinced that either petitioners or Jean intended a debtor-creditor relationship, an element of a bona fide debt and a prerequisite for a bad debt deduction. Evans Clark, 18 T.C. 780 (1952), affd. per curiam 205 F.2d 43 353 (C.A. 2, 1953). See also Treasury Regulations section 1.166-1(c). We do not believe that petitioners reasonable expected repayment of the amounts advanced. They realized that the mines were Jean's only source of funds and that Jean had no mining experience prior to her purchase of Apache No. 1 and Apache No. 2. In 1949, petitioners *74 wrote off earlier advances as bad debts and could not reasonably have expected later advances to be repaid. Petitioners continued to advance money as recently as 1961, when it was fairly obvious that Jean could never repay. Although petitioners testified that they expected repayment, we conclude that their expectations are more aptly characterized as hopes and that those hopes were based on the remote possibility that Jean's mining activities would be profitable. Jean relied on petitioners' records of the advances and kept no records herself. Except for the Ribble note, there were no notes or other written evidence that the advances were intended to be loans. Except for the Ribble note, there were no provisions for interest or security, no definite understandings as to the time or method of repayment, and no 44 fixed maturity dates. We find no indication that petitioners attempted to collect any of the amounts advanced. See Harry K. Oliphint, supra, and Evans Clark, supra.
We have held that transactions between members of the same family are subject to especially rigid scrutiny. *75 Evans Clark, supra. Although Jean and Howard were not married at the time of the advances, the relationship between petitioners and Jean suggests that Howard and Morgan may have intended gifts rather than bona fide loans. Petitioners paid Jean's medical expenses, and helped her pay for her housing, her clothes, and her father's funeral. Howard wanted to make Jean independent and to assist Jeanene. Jean testified that Morgan and Howard were "the best friends * * * [she] ever had in * * * [her] life." The Commissioner argues that repayment of the amounts advanced was expressly contingent on income from the mines and, since the mines did not produce a profit, the purported debt was not enforceable. Evans Clark, supra. We are unwilling to conclude that repayment was so conditioned; however, as discussed above, petitioners' knowledge that Jean could not pay without mining profits and that she was unlikely to have such profits indicates that petitioners could not reasonably expect repayment. 45 Petitioners suggest that the Ribble note should be treated differently from the other advances since it was claimed as a deduction on their original Federal *76 tax returns and since it was written and secured. We do not consider relevant the fact that the note alone was shown on petitioners return, for petitioners assert that the absence of the other advances was merely an accounting error. Nor do we believe that the note was written and secured controls our decision. Petitioners never attempted to enforce the note. They introduced no evidence to indicate that their payment to Ribble was any different from their payments to Jean's landlord, attorney, and other creditors. Petitioners also suggest that they attempted to collect the amounts advanced when, in 1961, they made payments to have the mining claims sold. They argue and to apply the proceeds to Jean's debt. The record does not contain evidence supporting the assertion that petitioners had such authority. Petitioners do not indicate when the purported authority was given or in what way that authority indicates a debtor-creditor relationship. We have no evidence to indicate the 46 possible selling price of the mine and no way of guessing for what portion of the advances petitioners could have expected repayment from the sale of the mines. Accordingly, we do not consider *77 the 1961 payments relevant to our determination that no bona fide debt existed. Even if we were to assume that a bona fide debt existed, petitioners considered their prior advances uncollectible and treated them as bad debts. The evidence does not indicate why petitioners believed that later advances were collectible. Petitioners rely on Jean's testimony that she was insolvent when she first lost the mine in the 1962 taxable year. But we have no evidence to indicate that Jean was solvent in earlier years. Indeed, petitioners' payment of Jean's personal expenses suggests that Jean had very little money at any time after the divorce. Petitioners propose that they be considered partners, "parties at interest," "co-tenants" or "ostensible partners" 47 in the mining operation and that the advances be treated as ordinary business losses under section 165. Petitioners denied any partnership with Jean in letters to her creditors.Petitioners paid many of Jean's personal expenses unrelated to the mining operation. Petitioners cite neither evidence nor authority for their proposition, and we reject it. Accordingly, we hold that petitioners have not shown that either section *78 165 or section 166 entitles them to deduct the money paid to or for the benefit of Jean. Decisions will be entered under Rule 50. Footnotes
*. Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on August 9, 1973 from Judge Austin Hoyt to Judge Norman O. Tietjens↩ for disposition. 1. The Stivers Brothers partnership and the Morgan and Howard partnership used taxable years ending August 31. All references herein to taxable years shall refer to those taxable periods ending on August 31 of those years. ↩
*. In his brief the Commissioner showed this figure as a loss. However, the exhibits indicate that Stivers Brothers had a gain of $9,036.87 in the 1960 taxable year. Whether Stivers Brothers realized a loss or profit is not of great consequence in our decision. ↩
2. Although the total acreage would seem to have been closer to 268.9 acres, in the exhibits and briefs, petitioners and the Commissioner refer to the Escondido land as 270 acres. For convenience, we sometimes use the 270 figure. ↩
*. The above figures are taken from the parties' stipulation of facts. Any discrepancies are unexplained. ↩
3. All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated. ↩